# United States Court of Appeals for the Federal Circuit

———————————

**NSK CORPORATION, NSK LTD.,** AND
**NSK EUROPE LTD.,**
*Plaintiffs-Appellees,*

AND

**FAG ITALIA, S.P.A., SCHAEFFLER GROUP USA,
INC., SCHAEFFLER KG, THE BARDEN
CORPORATION,** AND **THE BARDEN
CORPORATION (U.K.) LTD.,**
*Plaintiffs-Cross Appellants,*

AND

**JTEKT CORPORATION** AND
**KOYO CORPORATION OF U.S.A.,**
*Plaintiffs-Appellees,*

AND

**SKF AEROENGINE BEARINGS UK** AND
**SKF USA INC.,**
*Plaintiffs-Cross Appellants,*

v.

**UNITED STATES INTERNATIONAL TRADE
COMMISSION,**
*Defendant-Appellant,*

AND

**THE TIMKEN COMPANY,**
*Defendant-Appellant.*

———————————

2011-1362, -1382, -1383, -1454

_____

Appeals from the United States Court of International Trade in consolidated Nos. 06-CV-0334, 06-CV-0335, and 06-CV-0336, Judge Judith M. Barzilay.

_____

Decided: May 16, 2013

_____

ROBERT A. LIPSTEIN, Crowell & Moring, LLP, of Washington, DC, argued for plaintiffs-appellees, NSK Corporation, et al. With him on the brief was ALEXANDER H. SCHAEFER.

ANDREW T. SCHUTZ, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, argued for plaintiffs-cross appellants, FAG Italia, S.P.A., et al. With him on the brief was MAX F. SCHUTZMAN, of New York, New York.

CARTER G. PHILLIPS, Sidley Austin LLP, of Washington, DC, argued for plaintiffs-appellees, JTEKT Corporation, et al. With him on the brief were NEIL R. ELLIS and JILL CAIAZZO. Of counsel was LAWRENCE R. WALDERS.

HERBERT C. SHELLEY, Steptoe & Johnson LLP, of Washington, DC, for plaintiffs-cross appellants, SKF Aeroengine Bearings UK, et al. With him on the brief was CHRISTOPHER G. FALCONE.

NEAL J. REYNOLDS, Assistant General Counsel for Litigation, United States International Trade Commission, of Washington, DC, argued for defendant-appellant, United States International Trade Commission. With

him on the brief were JAMES M. LYONS, General Counsel, and DAVID A.J. GOLDFINE, Attorney Advisor. Of counsel were CLAUDIA BURKE, Assistant Director, United States Department of Justice, of Washington, DC, and DEBORAH R. KING, Senior Attorney, United States Department of Commerce, Office of the Chief Counsel for Import Administration, of Washington, DC.

TERENCE P. STEWART, Stewart and Stewart, of Washington, DC, argued for defendant-appellant, The Timken Company. With him on the brief were GEERT DE PREST, ERIC P. SALONEN and PHILIP A. BUTLER. Of counsel was PATRICK JOHN McDONOUGH.

————————————

Before NEWMAN, PROST, and O'MALLEY, *Circuit Judges.*

O'MALLEY, *Circuit Judge.*

This appeal arises out of the second sunset review of antidumping duty orders on ball bearings from France, Germany, Italy, Japan, and the United Kingdom (the "U.K."). Defendants-Appellants the United States International Trade Commission (the "Commission") and The Timken Company ("Timken") (collectively, "Appellants") appeal from the Court of International Trade's final judgment affirming the Commission's decisions—issued under protest—to revoke the antidumping orders on ball bearings from Japan and the U.K. *See NSK Corp. v. United States*, 774 F. Supp. 2d 1296 (Ct. Int'l Trade 2011) ("*NSK VI*") (affirming the Commission's negative determination with respect to Japan); *NSK Corp. v. United States*, 744 F. Supp. 2d 1359 (Ct. Int'l Trade 2010) ("*NSK V*") (affirming the Commission's negative determination with respect to the U.K. and remanding in part the Commission's *Third Remand Determination*).

Appellants also appeal the following interlocutory decisions leading to the final judgment: *NSK Corp. v. United*

*States*, 577 F. Supp. 2d 1322 (Ct. Int'l Trade 2008) ("*NSK I*") (affirming in part and remanding in part the Commission's affirmative sunset determinations for Japan and the U.K.); *NSK Corp. v. United States*, 593 F. Supp. 2d 1355 (Ct. Int'l Trade 2008) ("*NSK II*") (denying Timken and the Commission's motions for rehearing in light of intervening law); *NSK Corp. v. United States*, 637 F. Supp. 2d 1311 (Ct. Int'l Trade 2009) ("*NSK III*") (remanding the Commission's affirmative determinations regarding Japan and the U.K.); and *NSK Corp. v. United States*, 712 F. Supp. 2d 1356 (Ct. Int'l Trade 2010) ("*NSK IV*") (affirming in part and remanding in part the Commission's *Second Remand Determination*).

Appellants contend that the Court of International Trade erred by rejecting the Commission's determinations that (1) it was appropriate to cumulate (i.e., consider in the aggregate) the imports of ball bearings from the U.K., France, Germany, Italy, and Japan and (2) the cumulated imports would cause material injury to the domestic ball bearing industry if the antidumping orders were revoked. According to Appellants, the Commission's analysis was in full compliance with statutory and administrative obligations, and its findings were supported by substantial evidence.

FAG Italia, S.P.A., Schaeffler Group USA, Inc., Schaeffler KG, The Barden Corporation, and The Barden Corporation (U.K.) Ltd. (collectively, "Schaeffler") and SKF Aeroengine Bearings UK and SKF USA Inc. (collectively, "SKF") have cross-appealed, arguing that the Commission erred in limiting its determinations to the antidumping orders related to Japan and the U.K. According to Schaeffler and SKF, the Commission should have applied its negative injury determination to all countries cumulated.

Because we agree with Appellants that the Commission's *Second Remand Determination* was supported by

substantial evidence and that the Court of International Trade erred in repeatedly remanding the case, we: (1) reverse the Court of International Trade's decisions in *NSK V* and *VI* and judgment affirming the Commission's negative determinations regarding the orders on the U.K. and Japan; (2) vacate the Court of International Trade's decision in *NSK IV*; (3) instruct the Court of International Trade to vacate the Commission's negative material injury determinations in the *Third* and *Fourth Remand Determinations*; and (4) order the Court of International Trade to reinstate the Commission's affirmative material injury determination reached in the *Second Remand Determination*. Given these conclusions, the issues raised in Schaeffler's and SKF's cross-appeals are rendered moot.

BACKGROUND

This case has an extensive procedural history, including an original determination and four subsequent remand determinations by the Commission, as well as six opinions from the Court of International Trade.

The Original Antidumping Order
and First Sunset Review

In May 1989, the Commission determined that the United States' domestic industry for ball bearings was being materially injured by sales of ball bearings imported from France, Germany, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the U.K. at less than fair value. The Department of Commerce ("Commerce") published the antidumping order on those bearings on May 15, 1989. *See Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom*, 54 Fed. Reg. 20,900-20,911 (May 15, 1989).

Pursuant to 19 U.S.C. § 1675(c), every five years after the issuance of an antidumping duty order, Commerce and the Commission conduct a review of whether an antidumping order is still necessary to protect the domestic industry or whether that order can be "sunset." In these "sunset reviews," the Commission determines "whether revocation of an order . . . would be likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time." 19 U.S.C. § 1675a(a)(1).

In 1999, the Commission initiated its first sunset review and found that revocation of the antidumping orders likely would lead to material injury to the domestic industry. Accordingly, in June 2000, the Commission issued affirmative determinations for France, Germany, Italy, Japan, Singapore, and the U.K., which resulted in the continuation of the antidumping orders. *See Continuation of Antidumping Duty Orders: Certain Bearings from France, Germany, Italy, Japan, Singapore, the United Kingdom, and the People's Republic of China*, 65 Fed. Reg. 42,665 (July 11, 2000).

The Second Sunset Review

The Commission initiated a second sunset review of the antidumping orders in June 2005. On August 31, 2006, the Commission issued its final determinations, unanimously finding that revocation of the antidumping duty orders on bearings from China, France, Germany, Japan, and the U.K. likely would lead to continuation or recurrence of material injury to the domestic industry within a reasonably foreseeable time.[1] *See Certain Bearings From China, France, Germany, Italy, Japan, Singapore, and the United Kingdom*; Investigation Nos. 731-TA-

---

[1] The Commission issued a negative determination for Singapore.

344, 391-A, 392-A and C, 393-A, 394A, 396, and 399-A (Second Review), 71 Fed. Reg. 51,850 (Aug. 31, 2006).

In its determinations, the Commission cumulated the subject imports from France, Germany, Italy, Japan, and the U.K. under 19 U.S.C. § 1675a(a)(7) on grounds that imports from the cumulated countries were likely to compete with one another and with the domestic products, and would have a "discernible adverse impact" on the industry if the orders were revoked. First, the Commission found that the volume of cumulated imports would be significant after revocation, especially given that the subject producers were highly export-oriented, ranked among the largest exporters of ball bearings in the world, and had substantial excess capacity during the period of review ("POR"). The Commission also found that the United States was an attractive market for exporters because it was the second largest market for ball bearings, and prices in the United States were higher than those in other markets. Regarding the likely price effects of revocation, the Commission found that, even with the orders in place, the subject imports undersold (i.e., were priced lower than) domestic ball bearings and were suppressing prices for the domestic product. Given the record evidence that price was an important factor in purchasing decisions and that domestic and subject bearings were substitutable, the Commission found that the subject imports likely would be priced aggressively to gain market share if the antidumping orders were revoked. The Commission concluded that revocation of the antidumping orders likely would lead to significant underselling by the cumulated imports, as well as significant price suppression.

## NSK I and NSK II

In September 2006, NSK Corporation, NSK Ltd., and NSK Europe Ltd. (collectively, "NSK") appealed the Commission's affirmative determinations for ball bearings

from Japan and the U.K. to the Court of International Trade. NSK Corporation produces ball bearings in the United States and imports bearings from its affiliated companies: (1) NSK Ltd., a Japanese producer of ball bearings; and (2) NSK Europe, a U.K. producer and exporter of ball bearings.

Likewise, in September 2006, JTEKT Corporation and Koyo Corporation of U.S.A. (collectively, "JTEKT") appealed the Commission's final determination with respect to Japan. JTEKT Corporation is a Japanese manufacturer and exporter of subject ball bearings, and Koyo Corporation of U.S.A. is a domestic importer of bearings from Japan. The Court of International Trade consolidated NSK's and JTEKT's appeals in January 2007.

In November 2006, Schaeffler and SKF intervened as of right in the appeal. Schaeffler produces subject ball bearings in the United States, the U.K., Germany, and Italy. SKF is a domestic producer and importer of the subject merchandise from France, Germany, Italy, and the U.K.

On September 9, 2008, the Court of International Trade issued its first decision, affirming the Commission's determinations in part and remanding in part. Specifically, the court affirmed the Commission's determinations that: (1) the subject imports are likely to have a reasonable competitive overlap with the domestic product; (2) there likely would be a significant volume of subject imports upon revocation of the orders; and (3) the subject imports likely would have significant price effects upon revocation. *See NSK I*, 577 F. Supp. 2d at 1336-37, 1342-47.

The court remanded three issues to the Commission. First, relying on this court's decision in *Bratsk Aluminum Smelter v. United States*, 444 F.3d 1369 (Fed. Cir. 2006), the Court of International Trade held that:

> "whenever [a sunset review] is centered on a commodity product, and price competitive non-subject imports are a significant factor in the market," the ITC must consider whether non-subject imports have captured or are likely to capture market share previously held by the subject imports, and whether this level of displacement makes it unlikely that removal of the orders will lead to a continuation or recurrence of material injury as a result of subject imports.

*NSK I*, 577 F. Supp. 2d at 1333 (alteration in original) (quoting *Bratsk*, 444 F.3d at 1375). Because ball bearings are "sufficiently fungible to satisfy the 'commodity product' test under *Bratsk*" and "non-subject imports are a significant factor in the domestic industry," the court instructed the Commission to conduct "a full review of the impact of non-subject imports on the domestic industry." *Id.* at 1334. Next, the court instructed the Commission to reconsider its vulnerability finding in light of the "large scale restructuring within the ball bearing industry that could explain much of the seemingly negative data." *Id.* at 1339. Finally, the court remanded the Commission's decision to cumulate imports from the U.K. "for additional explanation as to whether the potential volumes of U.K. exports . . . are likely to have an adverse impact on the domestic industry if the order is removed." *Id.* at 1338.

Nine days after *NSK I* issued, this court issued its decision in *Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867 (Fed. Cir. 2008), clarifying that Bratsk "was directed to determining the cause of the injury already suffered by the domestic industry." *Mittal Steel*, 542 F.3d at 876. Specifically, we explained that the causation inquiry discussed in *Bratsk* was "not concerned with whether an antidumping duty order would actually lead to the elimination of those goods from the market in the future or whether those goods would be replaced by goods from other sources." *Id.* Instead, the "focus of the inquiry

is on the cause of injury in the past, not the prospect of effectiveness in the future." *Id.*

In light of *Mittal Steel*, Timken and the Commission moved the Court of International Trade to reconsider its decision in *NSK I*. Specifically, they argued that the court erred in its interpretation of *Bratsk* and that the Commission was not required, in a sunset review, to determine whether non-subject imports had replaced, or were likely to replace, subject imports. The Court of International Trade disagreed and denied the motions for rehearing, noting that nothing in *Mittal Steel* prevented it "from holding that the non-subject import analysis is proper in a sunset review when the triggering factors are present"— i.e., when the subject merchandise is a commodity product and non-subject imports are a significant factor in the market.[2] *NSK II*, 593 F. Supp. 2d at 1372.

Given the court's conclusions in *NSK II*, and consistent with the remand instructions in *NSK I*, the Commission reopened the record to obtain information to conduct an analysis of non-subject imports. *See Ball Bearings from Japan and the United Kingdom*, Investigation Nos. 731-TA-394-A & 399-A (Second Review) (Remand), 74 Fed. Reg. 6173 (Feb. 5, 2009). The Commission sent questionnaires to 76 producers of non-subject ball bearings and received usable responses from 18 producers located in 10 different countries. *Certain Ball Bearings and Parts Thereof From Japan and the United Kingdom*, Investigation Nos. 731-TA-394-A and 399-A, 2009 ITC LEXIS 1516, at *117 (May 2009) ("*First Remand Determination*").

---

[2] Neither the Commission nor Timken has appealed the Court of International Trade's decision that the principles articulated in *Bratsk* and clarified in *Mittal Steel* are applicable to sunset reviews.

First Remand Determination

On May 4, 2009, the Commission issued its *First Remand Determination*, reaffirming its original findings. First, the Commission again exercised its discretion to cumulate subject imports of ball bearings from Japan and the U.K. with subject imports from France, Germany, and Italy. As to the U.K., the Commission found that subject imports of ball bearings from the U.K. likely would have a discernible adverse impact on the domestic industry if the order covering U.K. bearings were revoked because: (1) the U.K. remains a substantial producer of ball bearings; (2) even with the antidumping order in place, "subject imports of ball bearings from the [U.K.] have maintained a stable and consistent presence in the U.S. market"; and (3) although U.K. producers reported declines in their production levels, they "actually increased their total shipments of all ball bearings (in terms of value) during the period of review." *See First Remand Determination*, 2009 ITC LEXIS 1516, at *55-61. The Commission further found that, upon revocation, U.K. producers are likely to direct additional shipments of ball bearings to the United States, particularly because there is a high degree of substitutability between U.K. and domestic ball bearings and prices for ball bearings are generally higher in the domestic market than in other markets. *Id*. at *59-61. Given this evidence, the Commission concluded that U.K. producers "are likely to take advantage of the revocation of the order to compete more aggressively with both the domestic and non-subject ball bearings suppliers on price and thereby increase their market share." *Id*. at *61-62.

Next, the Commission reconsidered its vulnerability analysis in light of the "significant rise in non-subject imports" and the "large scale restructuring within the ball bearing industry." *Id*. at *63. Because the record showed declines in the industry's capacity, production, and sales levels during the POR, the Commission concluded that

the industry "was in a weakened condition at the end of the period and was therefore vulnerable to likely material injury from the subject imports." *Id.* at *80.

Finally, the Commission concluded that non-subject imports have not captured, and are not likely to capture, market share previously held by subject imports given that: (1) subject imports maintained significant market share since the imposition of the orders; (2) "most of the market share increases obtained by the non-subject imports occurred at the expense of the domestic industry"; and (3) data received from producers in non-subject countries in response to the Commission's questionnaires indicated that many of them had shipped few, if any, ball bearings to the United States. *Id.* at *98-108. Given these circumstances, the Commission again concluded that revocation of the antidumping duty orders on ball bearings from Japan and the U.K. is "likely to lead to continuation or recurrence of material injury . . . within a reasonably foreseeable time." *Id.* at *111-12.

## NSK III

In August 2009, the Court of International Trade issued its decision in *NSK III*. In that decision, the court remanded the same three issues it previously had remanded for further analysis in *NSK I* on grounds that the Commission did not "genuinely comply with the court's remand instructions" or "meaningfully demonstrate a rational connection between the facts in the record and the conclusions reached." *NSK III*, 637 F. Supp. 2d at 1319.

With respect to the Commission's analysis of causation and the impact of non-subject imports, the court found that the Commission "failed to adequately explain why subject imports would be more than a minimal or tangential cause of likely injury given the significant price underselling by non-subject imports." *Id.* at 1323. Because the *First Remand Determination* did not establish a

link between the subject imports and likely future injury to the domestic industry, the court instructed the Commission to "perform a more focused analysis on the causation issue . . . in light of the significant presence of non-subject imports in the domestic market." *Id.* at 1323-24.

The court also directed the Commission to reconsider its vulnerability findings. Specifically, the court found that the Commission "failed to sufficiently address the effect of restructuring within the ball bearing industry" and did not address "whether the domestic industry is vulnerable to increased volumes of subject imports or is simply responding to other market forces." *Id.* at 1328. The court instructed the Commission to address conflicting evidence in the record in reaching its conclusions on vulnerability and the likely impact of subject imports on the domestic industry.

Finally, the court found that the Commission failed to support its decision to cumulate ball bearings from the U.K. with other subject imports. *Id.* at 1328-29. The court again remanded this issue to the Commission with instructions to consider the large scale restructuring within the industry and "the significant rise in non-subject imports in the U.S. market." *Id.* at 1329.

Second Remand Determination

In January 2010, the Commission issued its *Second Remand Determination*, reaffirming its original findings. *See Certain Ball Bearings and Parts Thereof From Japan and the United Kingdom*, Investigation Nos. 731-TA-394-A and 399-A, 2010 ITC LEXIS 431 (January 2010) ("*Second Remand Determination*"). At the outset, the Commission addressed the vulnerability of the domestic ball bearing industry. Specifically, the Commission found that the domestic industry was in a weakened state and "reduced its overall production capacity from 448.8 million BBs in 2000, the first year of the period of review, to 338.4 million BBs in 2005, the last year of the period." *Id.* at

*41.  Although the industry attempted to restructure its operations by reducing production capacity during the POR, the Commission nonetheless concluded that the industry, as a whole, was in a vulnerable condition, making it susceptible to the likely discernible adverse impact of subject imports.  *Id.* at *60-61.

Next, the Commission found that, despite restructuring within the industry, subject imports from the U.K. were likely to have a discernible adverse impact on the domestic industry upon revocation of the antidumping order covering them.  Specifically, the Commission found that U.K. imports were well suited to compete more aggressively in the market if the orders were revoked, particularly given the U.K.'s "level of available capacity in 2005, its high degree of export-orientation, its continued presence and interest in the U.S. market, and the continued attractiveness of the U.S. market to exporters."  *Id.* at *70-72.  The Commission also found that, even with the antidumping order in place, U.K. imports were able to undersell domestic products by "significant margins."  *Id.* at *74-75.  Although the Commission recognized that non-subject imports are a significant presence in the market, it found that they have not prevented the subject imports from the U.K. from "maintaining a consistent and stable presence in the market."  *Id.* at *79.  Given these considerations, and because U.K. bearings are substitutable with both domestic and non-subject bearings, the Commission concluded that the subject imports from the U.K. would be able "to increase their import levels to the very small percentage of market share necessary to satisfy the discernible adverse impact standard, even with the significant presence of non-subject imports in the market."  *Id.* at *81 (citation and internal quotation marks omitted).

Next, the Commission found that, despite the significant presence of low-priced, non-subject imports, "the subject imports are likely to be more than a minimal or tangential factor in the material injury to the domestic

industry that is likely to continue or recur upon revocation of the orders." *Id.* at *101-02. In reaching this conclusion, the Commission noted that subject imports "retained significant market share" during the POR with a market share of 13.2 percent in 2005. *Id.* at *111. As such, non-subject imports "are not likely to prevent the cumulated subject imports from increasing their presence in the market to levels that will have a significant adverse impact on the pricing and condition of the domestic industry, once the disciplining effects of the orders are revoked." *Id.* at *129. According to the Commission, the record showed that the subject imports were substitutable with both domestic and non-subject bearings and that the subject producers were export-oriented and had "significant available capacity" that could be used to increase imports to the United States. *Id.* at *130-31. Given these factors, and because "subject imports remain well-suited to compete more aggressively on price with both the domestic and nonsubject bearings," the Commission concluded that non-subject imports would not prevent the cumulated imports from materially injuring the domestic industry once the orders were revoked. *Id.* at *131-32.

## NSK IV

In April 2010, the Court of International Trade affirmed the Commission's vulnerability analysis but again remanded its decision to cumulate ball bearings from the U.K. with other subject imports. *NSK IV*, 712 F. Supp. 2d at 1364, 1368. The court faulted the Commission for its "assum[ption] that the subject [U.K.] producers would ship all excess capacity to the United States in the absence of the [antidumping] order" and determined that "the Commission does not support with substantial evidence its conclusion that the [U.K.] industry likely would export an additional discernible amount of its products to the United States upon revocation." *Id.* at 1365-66. According to the court, the Commission also "fail[ed] to explain rationally how [U.K.] ball bearings would compete

with domestic ball bearings and non-subject imports in the absence of the order and, thus, likely reach the requisite level of impact." *Id.* at 1365. Consequently, the court concluded that the Commission did not support its cumulation determination with substantial evidence and instructed the Commission that it could "reopen the record and obtain additional data . . . if it so chooses." *Id.* at 1367.

The court further indicated that, because of the shortcomings in the Commission's cumulation analysis, it could not address the remaining issues of likely impact and causation. *Id.* at 1368. Nonetheless, the court noted that "non-subject imports may prevent the subject imports from achieving the requisite level of causation," given that non-subject imports "increased their market share . . . and ha[d] undersold the domestic like product and subject imports in at least two-thirds of the possible price comparisons." *Id.* at 1368. The court instructed the Commission to "address this information as part of the causation inquiry." *Id.*

Third Remand Determination

In August 2010, the Commission issued its *Third Remand Determination*. *See Certain Ball Bearings and Parts Thereof From Japan and the United Kingdom*, Investigation Nos. 731-TA-394-A and 399-A (August 2010) ("*Third Remand Determination*"). The Commission elected not to reopen the record on remand based on its determination that "the existing record contained a complete data set with respect to the capacity, production, and shipment levels of the U.K. ball bearings industry as well as comprehensive information relating to other factors bearing on the discernible impact finding for the [U.K.]." *Id.* at 10. The Commission "continue[d] to maintain that the existing record supports [its] finding that subject imports of ball bearings from the [U.K.] are likely to have a discernible adverse impact on the domestic

industry if the antidumping duty order were to be re-voked" but concluded that it was "constrained by the Court's remand instructions to find that subject imports from the [U.K.] are not likely to have a discernible ad-verse impact upon revocation." *Id.* at 11-12. The Com-mission determined that it was "also compelled not to cumulate subject imports from the [U.K.] with subject imports from the other four subject countries." *Id.* at 12.

The Commission, however, "determine[d] that revoca-tion of the order on BBs from Japan would likely result in the continuation or recurrence of material injury to an industry in the United States within a reasonably fore-seeable time." *Id.* at 13. In reaching this conclusion, the Commission continued to cumulate imports of ball bear-ings from Japan with those from France, Germany, and Italy. *Id.* at 12 n.56. The Commission reassessed the conditions of competition with respect to the domestic industry, as well as the likely volume and price effects of the cumulated subject imports. *Id.* at 13-23. According to the Commission, "the volume of the subject BB imports from [the cumulated countries] would likely be significant in the reasonably foreseeable future if the orders were revoked" based on, among other things, the fact that the subject countries are "highly export-oriented" and have "substantial excess [production] capacity which could easily be directed at the U.S. market if the orders were revoked." *Id.* at 16-17, 19-20. The Commission also stressed that there is "a high degree of interchangeability between subject imports and the domestic like product" and that "higher prices in the United States" provide the subject countries with a strong incentive to export ball bearings to the United States. Regarding the likely impact of revocation on the price of ball bearings, the Commission concluded that revocation would have "signif-icant price suppressing and price depressing effects" based on its assessment of demand, substitutability, and other factors related to competition. *Id.* at 20-23. Accord-

ing to the Commission, such price effects would damage the domestic industry, particularly in light of the industry's increasing costs of production. *See id.*

The Commission further determined that the presence of non-subject imports "would not impair the subject imports' ability to gain significant market share at the expense of the domestic industry." *Id.* at 34. "[F]ind[ing] that the domestic industry is in a vulnerable condition and is therefore susceptible to likely material injury from the cumulated subject imports," the Commission stressed that, despite the "significant presence of low-priced non-subject imports in the U.S. market, the subject imports have maintained a significant presence in the U.S. market since the imposition of the orders" and have "increased (by value) by $69.0 million dollars, or by 24.6 percent" during the final three years of the POR. *Id.* at 30, 32. The Commission determined that, following revocation, "the subject producers w[ould] have the ability to increase substantially their U.S. market penetration" and would "likely revert to their more aggressive volume and underselling strategies." *Id.* at 32-33 (footnotes omitted).

NSK V

In December 2010, the Court of International Trade upheld the Commission's negative conclusions on ball bearings from the U.K. and sustained the Commission's findings that the cumulated subject imports likely would have significant volume and price effects on the industry if the antidumping orders were revoked. *NSK V*, 744 F. Supp. 2d at 1363-64. The court, however, remanded the Commission's affirmative significant adverse impact and causation determinations. *Id.* at 1366. The court concluded that it could not "determine whether the cumulated subject imports likely will have a significant adverse impact on the vulnerable domestic industry in the absence of the antidumping orders" because the Commission

"ignored the influence of non-subject imports in the market." *Id.* at 1365. Similarly, the court concluded that "[w]ithout a more thorough examination of non-subject imports, [it could not] determine whether the cumulated subject imports constitute more than a minimal or tangential cause of injury to the domestic industry which will likely continue to recur." *Id.* at 1366. According to the court, "it appears . . . that if subject producers lower the prices of their imports, then the non-subject producers almost certainly will also drop their prices." *Id.* at 1365. As a consequence, the court concluded, "the non-subject imports likely would negate any significant adverse effect of lower-priced subject imports." *Id.* The court advised the Commission that it could "reopen the record and obtain additional data . . . at its discretion." *Id.*

### Fourth Remand Determination

In March 2011, the Commission issued its *Fourth Remand Determination. See Certain Ball Bearings and Parts Thereof From Japan and the United Kingdom*, Investigation Nos. 731-TA-394-A and 399-A (March 2011) ("*Fourth Remand Determination*"). The Commission stated that it "believe[d] that [its] likely impact analysis in the original and remand determinations w[as] supported by ample record evidence and that the record evidence on this issue [was] reasonably complete." *Id.* at 15. Nonetheless, the Commission concluded that it was "compelled by the Court's instructions to determine that these subject imports are not likely to have a significant impact upon revocation." *Id.* at 16-17.

### NSK VI

In April 2011, the Court of International Trade sustained the Commission's findings "that subject imports would likely not have a significant adverse impact or cause injury to the domestic industry in the absence of the antidumping duty orders." *NSK VI*, 774 F. Supp. 2d at 1297. Even though it affirmed the Commission's findings,

the court criticized the Commission for "continu[ing] to mischaracterize the court's remand instructions and to mistakenly insist that the court compelled this result." *Id.*

The Commission and Timken timely appealed, and Schaeffler and SKF timely cross-appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## DISCUSSION

### A.  Legal Standards

In conducting a sunset review, the Commission is required to "determine whether revocation of an order . . . would be likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time." 19 U.S.C. § 1675a(a)(1). The Commission must "consider the likely volume, price effect, and impact of imports of the subject merchandise on the industry if the order is revoked." *Id.*

### B.  Standard of Review

The parties disagree regarding the appropriate standard for review. NSK and JTEKT contend that the relevant inquiry is whether the Court of International Trade abused its discretion in remanding the Commission's determinations with respect to Japan and the U.K. Timken and the Commission, however, assert that the relevant inquiry is whether the Commission's determinations were supported by substantial evidence.

The appropriate standard of review depends on the posture of the case. *Nippon Steel Corp. v. U.S. Int'l Trade Comm'n*, 494 F.3d 1371, 1378 (Fed. Cir. 2007). When the Court of International Trade orders the Commission to enter a negative determination, this court steps into the shoes of the trade court and conducts a de novo review of whether the Commission's determinations are supported by substantial evidence. *Id.* This court also reviews the

Commission's determinations for substantial evidence when the Court of International Trade "remand[s] to the Commission, giving it two options on how to proceed: [1] reopen the record in order to obtain substantial evidence to support its adverse impact conclusion or [2] make a determination that subject imports will have no adverse impact should the orders be revoked." *Id.* (alterations in original) (citation and internal quotation marks omitted). By contrast, we review remand orders issued by the Court of International Trade for abuse of discretion when the trade court does not assess the sufficiency of the evidence supporting the Commission's determinations or require additional investigation by the Commission, but "merely remand[s] the matter for additional explanation that would clarify the Commission's determination." *Altx, Inc. v. United States*, 370 F.3d 1108, 1117 (Fed. Cir. 2004) (internal quotation marks omitted).

With respect to the case before us, we conclude that it is appropriate to conduct a de novo review of the Court of International Trade's decisions, assessing whether the Commission's determinations were supported by substantial evidence. The trade court made numerous substantive assessments of the Commission's determinations. For instance, in *NSK V*, the trade court expressed its view "that the existing record, taken as a whole, cannot support an affirmative finding on likely significant adverse impact." 744 F. Supp. 2d at 1366-67; *see also NSK IV*, 712 F. Supp. 2d at 1367 ("The court does not believe that the existing record, taken as a whole, can support an affirmative discernible adverse impact finding."). Similarly, in *NSK IV*, the court "question[ed] the reasonableness of the Commission's statement" that U.K. imports maintained a stable presence in the domestic market, and the court stated that it was "not persuaded" by the Commission's determination that U.K. producers were likely to compete aggressively on price in the absence of the antidumping order affecting them. 712 F. Supp. 2d at 1366. Thus, like

the Court of International Trade in *Nippon Steel*, the trade court in the instant case disagreed with the Commission's substantive assessments and left the Commission with two options: (1) reopen the record and make additional findings or (2) issue a negative determination.[3] *Nippon Steel*, 494 F.3d at 1378. Consequently, reviewing the Commission's determinations for substantial evidence is appropriate. *See* 19 U.S.C. § 1516a(b)(1)(B)(i) (requiring courts to affirm a determination of the Commission unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law"). "Substantial evidence is 'more than a mere scintilla' and 'such relevant evidence as a reasonable mind would accept as adequate' to support a conclusion." *In re Pacer Tech.*, 338 F.3d 1348, 1349 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

---

[3] JTEKT argues on appeal that an abuse of discretion standard should apply because the Court of International Trade did not review the merits of the Commission's findings. In its comments to the Commission during the Fourth Remand Proceedings, however, JTEKT asserted that "based on the finding in *NSK V* that the record does not provide substantial evidence supporting an affirmative determination as to subject imports from Japan, JTEKT submits that the Commission *must* conclude that revocation of the antidumping duty order against ball bearings from Japan would not be likely to lead to the continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time." JA3245 (emphasis added). JTEKT's comments reinforce our conclusion that the Court of International Trade left the Commission with no options other than to reopen the record or reach a negative determination for the U.K. and Japan.

## C.  Cumulation

The Commission may, in its discretion, "cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which [sunset] reviews . . . were initiated on the same day, if such imports would be likely to compete with each other and with domestic like products in the United States market."   19  U.S.C.  § 1675a(a)(7).   The Commission, however, is prohibited from making cumulative assessments in "case[s] in which it determines that such imports are likely to have no discernible adverse impact on the domestic industry." *Id.*  This court has noted the "discernible adverse impact standard presents a relatively low threshold." *Nippon Steel*, 494 F.3d at 1379 n.6.

The Commission's discernible adverse impact analysis is at the heart of the dispute regarding the Commission's decision to cumulate imports from the U.K. with those of the other subject countries.   Appellants contend that substantial evidence supported the Commission's determination that imports from the U.K. would have a discernible adverse impact on the domestic ball bearing industry if the antidumping order were removed.  According to Appellants, in remanding the Commission's determination in *NSK IV*, the trade court impermissibly substituted its own judgment for that of the Commission and contradicted its earlier rulings in *NSK I*.

The Commission made a number of findings supporting its conclusion that revocation of the order covering U.K. ball bearings likely would have a discernible adverse impact on the domestic industry.  In particular, in its *Second Remand Determination*, the Commission found that the domestic industry was particularly susceptible to adverse effects from U.K. imports because it "was in a vulnerable condition at the end of the period of review." 2010 ITC LEXIS 431, at *40.  The Commission based its conclusion on, among other things, evidence of declining

productivity, capacity utilization, and profits, as well as a deteriorating cost structure. *Id.* at *40-49. The Commission also observed that "[t]here is a significant degree of substitutability among the domestic bearings, the U.K. imports, and non-subject imports," meaning that price is often dispositive in purchasers' decision-making. *Id.* at *73. The Commission also found that "U.K. imports . . . undersold the domestic like product in 45 out of 48 instances" and "the margins of underselling for the U.K imports were considerable." *Id.* at *74-75. In addition, the Commission found that high prices available for ball bearings in the United States made it an attractive market for U.K. producers to target. *Id.* at *85. Further, the Commission observed that U.K. producers could significantly increase their supply of ball bearings to the United States. Although U.K. producers reduced their production capacity and had a "very high capacity utilization rate," the Commission observed the U.K. "was the tenth largest ball bearing exporter in the world in 2004" and its producers had sufficient available capacity "to increase [their] shipments to the United States, in terms of quantity, more than ten-fold when compared to the import levels for U.K. imports in 2005." *Id.* at *70.

The Commission also specifically considered the role of non-subject imports in the marketplace and observed that "non-subject imports have not been able to prevent the subject imports from the [U.K.] from maintaining a consistent and stable presence in the market, even with the price- and volume-disciplining effects of the U.K. order in place." *Id.* at *79-80. The Commission also noted that the U.K. imports and "non-subject imports were generally underselling the domestic products at similar underselling margins in most instances during the period of review." *Id.* at *77. Consequently, in the Commission's view, non-subject imports were not likely to "prevent the entry of additional imports from the [U.K.] into the market upon revocation of the order." *Id.* at *79.

NSK argues that these conclusions were not adequately supported by the record and that the court was correct to remand the determination for further explanation, particularly in light of a number of facts that detract from the Commission's conclusions. For instance, as the court noted in *NSK IV*, U.K. producers were "operat[ing] near maximum capacity" and thus had a limited ability to produce additional ball bearings and ship them to the United States if the antidumping order were lifted. 712 F. Supp. 2d at 1365. In addition, the court faulted the Commission for failing to provide evidence supporting its "implicit[] assum[ption] that the [U.K.] producers would ship all excess capacity to the United States in the absence of the order." *Id.* The court also observed a "significant downward change in the subject imports' market share in terms of value since the first period of review," which detracted from the Commission's conclusion that the U.K. maintained a stable presence in the domestic market.[4] *Id.* at 1366. Finally, NSK highlights the considerable success U.K. producers have enjoyed in markets outside the United States, which, according to NSK, suggests a shift in focus away from the United States market.

Having reviewed the entire body of record evidence, we conclude that substantial evidence supports the Commission's determination that U.K. imports likely would have a discernible adverse impact on the domestic ball bearing industry if the antidumping order were removed. The Commission found that U.K. producers (1) were able to send a sufficient volume of bearings to the United

---

[4]    In *NSK I*, however, the Court of International Trade stated: "As subject imports from the [U.K.] have remained steady in terms of value throughout the review period, the [Commission] reasonably found that U.K. producers maintain a significant share of the U.S. market." 577 F. Supp. 2d at 1337.

States to impact the market, (2) had incentives to target the United States' bearings market, (3) sold bearings that largely were interchangeable with domestic bearings and those made by non-subject producers, and (4) could compete successfully with both domestic and non-subject bearings on price. Although there is evidence that detracts from the Commission's ultimate conclusion that revocation of the order covering U.K. ball bearings likely would damage the domestic industry, we cannot say that this conflicting evidence casts such doubt on the Commission's conclusions to leave less than a mere scintilla of evidence or less evidence than a reasonable mind might accept as adequate to support the Commission's conclusion. *See Atl. Sugar Ltd. v. United States*, 744 F.2d 1556, 1563 (Fed. Cir. 1984) (determining that the Commission's determination was supported by substantial evidence despite significant conflicting evidence). "Under the substantial evidence standard, when adequate evidence exists on both sides of an issue, assigning evidentiary weight falls exclusively within the authority of the Commission." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1358 (Fed. Cir. 2006). "'It is the Commission's task to evaluate the evidence it collects during its investigation,'" and decisions "'such as the weight to be assigned to a particular piece of evidence, lie at the core of that evaluative process.'" *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350 (quoting *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996)). Consequently, we reverse the Court of International Trade's order affirming the Commission's decision under protest not to cumulate U.K. imports with those of the other subject countries and order the court to reinstate the Commission's decision in its *Second Remand Determination* to cumulate imports from the U.K. with those from the other subject countries.

## D. Affirmative Likely Injury

Appellants also request that we overturn the Court of International Trade's decisions in *NSK IV*, *NSK V*, and

*NSK VI* and reinstate the Commission's affirmative determinations for the U.K. and Japan. In its *Second Remand Determination*, the Commission concluded "that revocation of the antidumping duty orders covering imports of the subject ball bearings from Japan and the [U.K.], when cumulated with other subject countries, will result in the recurrence or continuation of material injury to the domestic bearings industry." 2010 ITC LEXIS 431, at *98-99. According to Appellants, substantial evidence supported the Commission's affirmative determinations, and the Commission provided a reasonable explanation of how its conclusions followed from its factual findings. Thus, Appellants contend that the Court of International Trade inappropriately remanded the Commission's determinations and left the Commission with no choice but to issue negative determinations that did not align with its reasonable conclusions.

The Commission set out a number of findings indicating that the revocation of the antidumping orders covering subject imports from the U.K. and Japan, when cumulated with those of the other subject countries, "would be likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time." 19 U.S.C. § 1675a(a)(1). The Commission observed that subject producers had sufficient excess capacity to increase their exports to the United States significantly. *Second Remand Determination*, 2010 ITC LEXIS 431, at *84. Further, the Commission determined that the United States—the second largest importer of ball bearings— is an attractive market that offers sellers higher prices for ball bearings than they could receive in foreign markets. *Id.* at *84-85. Thus, the Commission set out facts indicating that the cumulated subject countries had strong incentives, as well as the ability, to ship significant amounts of ball bearings to the United States.

Paying particular attention to the competitive interplay among subject imports, non-subject imports, and

domestic product, the Commission made a number of findings supporting its conclusion that the domestic bearings industry likely would be materially injured if the orders at issue were revoked. The Commission reiterated its determination that "the industry is in a vulnerable condition" based on its observation that "the domestic industry continued to experience significant declines in capacity utilization, productivity, profitability, and market share levels over the course of the [POR] and saw its cost structure continue to erode." *Id.* at *99-100. Thus, according to the Commission, the domestic industry is "susceptible to material injury from the cumulated subject imports if the orders covering the cumulated subject imports are revoked." *Id.* at *99. Further, the Commission again stressed that there is a high degree of substitutability among domestic bearings, subject imports, and non-subject imports, making price a very important factor in purchasers' decision-making. *Id.* at *112.

With respect to the likely impact of revocation of the orders on pricing and competition, the Commission determined that "subject imports were likely to significantly undersell the domestic products and were likely to have significant adverse effects on domestic prices upon revocation of the orders." *Id.* at *86. The Commission found that subject imports frequently undersold domestic ball bearings, even with the orders in place, suggesting that "the cumulated subject imports are likely to become more aggressive on price when competing with domestic bearings." *Id.* at *121. The Commission also concluded that "subject imports have the ability to undersell the domestic like products as frequently and significantly as the non-subject imports did during the second period of review" based on its examination of the underselling done by subject and non-subject imports. *Id.* at *122. In particular, the Commission observed that, "[d]uring the first period of review, subject imports undersold domestic like products in 67.3 percent of comparisons, at an average

underselling margin of 34.0 percent with margins as high as 87 percent." *Id.* at \*122 (footnotes omitted). "[D]uring the second period of review, non-subject imports undersold domestic like products in 66.0 percent of comparisons, at an average underselling margin of 35.8 percent with margins as high as 83.4 percent." *Id.* The Commission further noted that "once the orders are revoked and the subject imports will resume a more aggressive pattern of underselling, it is likely that they will thereby take market share primarily from the domestic industry rather than the non-subject imports, given that the non-subject imports are priced lower than the domestic bearings." *Id.* at \*127. Accordingly, the Commission concluded "that the record establishes that, notwithstanding the significant presence of low-priced, non-subject imports in the U.S. market, the subject imports are likely to be more than a minimal or tangential factor in the material in jury to the domestic industry that is likely to continue or recur upon revocation of the orders." *Id.* at \*101-02.

Appellees allege that, in reaching these conclusions, the Commission did not consider adequately the impact of imports from non-subject countries. As a consequence, they assert that the Court of International Trade appropriately remanded the Commission's determinations for further explanation. In *NSK IV*, the court observed that "[n]on-subject imports have become a significant and price-competitive factor in the United States ball bearings market" and concluded that "non-subject imports may prevent the subject imports from achieving the requisite level of causation and, therefore, serve as an impenetrable barrier that precludes the agency from affirmatively finding injury in this sunset review." 712 F. Supp. 2d at 1368. Appellees argue that remand for further consideration was appropriate in light of considerable record evidence indicating that subject imports would cause, at most, a minimal or tangential injury to the domestic market if the orders at issue were revoked.

Appellees suggest that, even if the orders affecting imports from the subject countries were revoked, any harm to the domestic bearing industry would result from non-subject imports, as opposed to imports from the subject countries. In particular, Appellees point to the rapid growth of non-subject imports' market share, which increased from 5.2 percent in 1987 to 23.6 percent in 2005. Appellees also highlight the Commission's finding that price is an essential factor in purchasing decisions and stress that non-subject imports were typically priced lower than imports from subject countries. Appellees further assert that producers in subject countries would not be able to lower their prices sufficiently to be price-competitive with non-subject importers. In sum, Appellees contend that the subject imports would be unable to compete effectively with non-subject imports and thus would not be able to alter the market place significantly or cause material harm to the domestic industry.

Having reviewed the record as a whole, we conclude that the Commission appropriately determined that revocation of the orders covering the subject countries, in all likelihood, would materially injure a vulnerable domestic industry. Appellees are correct that numerous record facts detract from the Commission's conclusion. Non-subject imports had a significant presence in the domestic market during the relevant periods of review and were often sold at lower prices than domestic bearings and bearings from subject countries. These facts, however, do not detract from the Commission's findings to such an extent that we can say the Commission's determinations were not supported by substantial evidence. Instead, the Commission set out a sound factual basis for its conclusion that subject countries had the ability and incentive to cause material injury to the domestic industry if the relevant antidumping orders were revoked. As this court has noted in the past, "it is the role of the expert factfinder—here the majority of the Presidentially-

appointed, Senate-approved Commissioners—to decide which side's evidence to believe." *Nippon Steel*, 458 F.3d at 1359. Where, as here, "there is an adequate basis in support of the Commission's choice of evidentiary weight, the Court of International Trade, and this court, reviewing under the substantial evidence standard, must defer to the Commission." *Id.*

Further, the Commission specifically addressed and rejected Appellees' theories regarding the impact of non-subject imports, noting that significant portions of the record cast doubt on the interpretation of the facts that Appellees espouse. *See id.* at *101-32. The Commission observed that, "even with the restraining effects of the orders in place, the subject imports have remained a substantial and price-competitive factor in the market. . . . [T]heir share of the market has ranged between 11.5 and 14.2 percent during the first and second periods of review." *Id.* at *111. The Commission also observed that, although subject imports experienced declines in market share after the antidumping orders were put in place, "the subject imports retained a significant market share throughout the second period of review" and "increased their share of the market over the final three years" of the second period of review. *Id.* Thus, despite Appellees' assertion to the contrary, substantial evidence supports the Commission's analysis, which showed that subject imports could, and did, compete with non-subject imports. Consequently, we reverse the Court of International Trade's decisions in *NSK V* and *VI* and judgment affirming the Commission's negative determinations regarding the orders on the U.K. and Japan, and we order the Court of International Trade to reinstate the Commission's affirmative material injury determination reached in the *Second Remand Determination.*

## E.  Cross-Appeals

Schaeffler and SKF (collectively, "Cross-Appellants") argue that the negative determination with respect to Japan should have applied to Italy, Germany, and France as well.  Because we are reinstating the Commission's affirmative determinations with respect to these countries, however, the issues raised by Cross-Appellants are rendered moot.

## CONCLUSION

For the reasons stated above, we find that the Commission's affirmative determination in its *Second Remand Determination* was supported by substantial evidence, and the Court of International Trade erred by concluding otherwise.  Accordingly, we (1) reverse the Court of International Trade's decisions in *NSK V* and *VI* and judgment affirming the Commission's negative determinations regarding the orders on the U.K. and Japan; (2) vacate the Court of International Trade's decision in *NSK IV*; (3) instruct the Court of International Trade to vacate the Commission's negative material injury determinations in the *Third* and *Fourth Remand Determinations*; and (4) order the Court of International Trade to reinstate the Commission's affirmative material injury determination reached in the *Second Remand Determination*.

## REVERSED